T.C. Memo. 2007-343

UNITED STATES TAX COURT

RAMZY M. AND LENA KOPTY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4188-05.                    Filed November 21, 2007.

Ramzy M. and Lena Kopty, pro se.

<u>Cleve Lisecki</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WHALEN, <u>Judge</u>:  Respondent determined the following
deficiencies in, and penalties with respect to, petitioners'
Federal income tax for 1999 and 2000:

|       |            | Additions to Tax/Penalties | |
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6662(a) |
|------|-----------|-----------------|--------------|
| 1999 | $94,699.32 | $23,674.83 | $12,793.13 |
| 2000 | 1,000.00 | None | None |

Unless stated otherwise, all section references in this opinion are to the Internal Revenue Code as in effect during the years in issue.

The issues for decision are: (1) Whether the distributions received by petitioners during 1999 and 2000 from petitioner Ramzy M. Kopty's individual retirement account (IRA) in the aggregate amounts of $331,500 and $10,000, respectively, are includable in petitioners' gross income, pursuant to section 408(d); (2) whether petitioners are subject to the 10-percent additional tax on early distributions imposed by section 72(t) on the distributions received by petitioners from Mr. Kopty's IRA during 1999 and 2000; (3) whether petitioners are liable for the addition to tax of $23,674.83 determined by respondent under section 6651(a)(1) for failure to file a timely return for 1999; and (4) whether petitioners are subject to the accuracy-related penalty of $12,793.13 determined by respondent under section 6662(a) with respect to their 1999 return.

FINDINGS OF FACT

Petitioners are husband and wife. They resided in Waterloo, Belgium, at the time they filed their petition in this case. In

this opinion, references to petitioner are references to Mr. Ramzy M. Kopty.

From March 18, 1991, through the end of 1997, petitioner was employed by a software company, J.D. Edwards & Co. On or about July 1, 1992, he began participating in the J.D. Edwards Employee Stock Ownership Plan (ESOP), a qualified plan under which the company made contributions of its stock to petitioner's account in the plan. By December 31, 1997, when petitioner left the employ of J.D. Edwards & Co., the company had contributed 10,323.9064 shares of its stock into petitioner's ESOP account. Set out below are the number of shares of J.D. Edwards & Co. stock, the aggregate value of those shares of stock, the cash held in petitioner's ESOP account, and the total value of petitioner's account, at the end of each of the years 1992 through and including 1997:

| Year | Shares | Value | Cash | Total |
|------|--------|-------|------|-------|
| 1992 | 20.3100 | $3,756.70 | ($57.43) | $3,699.27 |
| 1993 | 36.1085 | 6,818.47 | 1,608.94 | 8,427.41 |
| 1994 | 66.0084 | 15,698.12 | 1,725.72 | 17,423.84 |
| 1995 | 108.1071 | 46,776.86 | 6.29 | 46,783.15 |
| 1996 | 144.5164 | 108,732.69 | 30.90 | 108,763.59 |
| 1996 | [1]10,116.1480 | | | |
| 1997 | 10,323.9064 | 304,555.24 | 10.31 | 304,565.55 |

[1]Number of shares restated to reflect a 70-to-1 stock split.

After petitioner left J.D. Edwards & Co. at the end of 1997, he began working through a sole proprietorship, Kopty Management Consulting. In that capacity, he provided management,

scientific, and technical consulting services to various clients. The Schedules C, Profit or Loss From Business, for petitioner's sole proprietorship that were filed with petitioners' returns for 1998, 1999, and 2000 are summarized below:

|  | 1998 | 1999 | 2000 |
|---|---|---|---|
| Income: | | | |
| 1 Gross receipts or sales | $114,634 | -0- | -0- |
| 2 Returns and allowances | -0- | | |
| 3 Subtract line 2 from line 1 | 114,634 | | |
| 4 Cost of goods sold | -0- | | |
| 5 Gross profit, subtract line 4 from line 3 | 114,634 | | |
| 6 Other income | -0- | | |
| 7 Gross income. Add lines 5 and 6 | 114,634 | -0- | -0- |
| Expenses: | | | |
| 10 Car and truck expenses | 2,340 | $2,340.00 | $1,270 |
| 11 Commissions and fees | 7,900 | 8,560.00 | 5,330 |
| 13 Depreciation and section 179 expense deduction | 3,756 | 3,756.00 | 1,430 |
| 18 Office expense | -0- | 667.59 | 267 |
| 20 Rent or lease | | | |
| a Vehicles, machinery, and equipment | | | |
| b Other business property | 1,500 | 24,931.51 | 18,670 |
| 24 Travel, meals, and entertainment | | | |
| a Travel | 33,288 | 10,208.49 | 2,450 |
| b Meals and entertainment $5,000 | | $3,415.00 | $1,760 |
| c Enter nondeductible amount 2,500 | | 1,707.50 | 880 |
| d Subtract line 24c from line 24b | 2,500 | 1,707.50 | 880 |
| 25 Utilities | -0- | 1,744.96 | 1,460 |
| 26 Wages (less employment credits) | None | 28,916.44 | 14,320 |
| 27 Other expenses | | | |
| Telephone | 7,191 | 12,588.64 | 6,380 |
| Other misc. | 2,300 | -0- | -0- |
| Total expenses | 60,775 | 95,421.13 | 52,457 |
| Net profit or (loss) | 53,859 | -95,421.13 | -52,457 |

Circa June of 1999, petitioner's wife and children moved from Dubai in the United Arab Emirates to Waterloo, Belgium. Until sometime during 2000, petitioner's business activities were based in Dubai, and he retained a residence there. Between June 1999 and the latter part of 2000, petitioner traveled between Belgium, where he and his family resided, and Dubai, where his business activities were centered. Some of the expenses claimed

on the above Schedules C for 1999 and 2000 reflect Mr. Kopty's travel between his home in Belgium and his business in the United Arab Emirates.

On or about July 1, 1998, after leaving the employ of J.D. Edwards & Co., petitioner sent a distribution request form to the company asking the company to distribute to him the shares of stock and cash held in his ESOP account. As completed by petitioner, the distribution request form states: "I elect a payout of all my whole shares of J.D. Edwards stock, plus cash, * * * payable to me with the applicable taxes withheld for federal tax."

On the following day, petitioner transmitted a facsimile of the distribution request form to a representative of Norwest Investment Services, Inc. (hereinafter Norwest). Several days later, on or about July 8, 1998, petitioner applied to open a self-directed IRA with Norwest. As completed by petitioner, the application states that petitioner wanted to establish a "Rollover IRA".

On or about July 15, 1998, in response to petitioner's distribution request, the ESOP's trustee, Wells Fargo Bank, sent 10,323 shares of J.D. Edwards & Co. stock to the transfer agent and registrar of the stock, Harris Trust Co. of California, with instructions to reissue the stock in petitioner's name. In accordance with those instructions, on or about July 30, 1998,

the transfer agent mailed to petitioner a stock certificate for 10,323 shares of J.D. Edwards & Co. stock. The stock certificate, No. JDE1185, was dated July 15, 1998. The shares represented by that stock certificate had not been registered under the Securities Act of 1933, and the stock certificate bore the following restricted legend:

> THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER SAID ACT OR OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED. * * *

Petitioner received the stock certificate from the transfer agent, but the record does not reveal precisely when he received it.

On August 4, 1998, 5 days after the stock certificate had been mailed to him by the transfer agent, petitioner hand-delivered it to Norwest. In return, a representative of Norwest gave petitioner a receipt for the stock certificate. The receipt states that the purpose of receiving the stock certificate was "Deposit to account". Thus, according to the receipt, Norwest received the J.D. Edwards & Co. stock certificate from petitioner for the purpose of depositing the shares into petitioner's rollover IRA at Norwest.

Mr. Kopty's rollover of the stock distribution from his ESOP account to his IRA was confirmed by the statement for petitioner's IRA which was issued by Norwest for the period

ending August 31, 1998. That statement records a "stock rollover DS" on August 24, 1998, consisting of 10,323 shares of J.D. Edwards & Co. stock valued at $40.50 per share in the aggregate amount $418,081.50. It is not clear from the record why the rollover was not booked into petitioner's account as of August 4, 1998, the date of the receipt issued by Norwest for petitioner's J.D. Edwards & Co. stock certificate.

A letter to petitioner dated August 11, 1998, written by a representative of the ESOP's trustee, Wells Fargo Bank, states as follows:

> You elected to take a distribution from the J.D. Edwards & Company (the "Company") Employee Stock Ownership Plan (the "ESOP"). In accordance with the terms of the ESOP and your distribution request form, a stock certificate in the amount of 10,323 shares. [sic] You will receive your stock certificate from J.D. Edwards in the near future.
>
> You elected not to rollover your ESOP account balance. As a result, the cash balance, consisting of your cash account and fractional shares, has been withheld for tax purposes. You will receive a 1099R in January 1999 to reflect your distribution. You may be liable for additional taxes concerning this distribution.

The above letter is wrong on two important points. First, as discussed above, by August 11, 1998, the date of the letter, petitioner had already received the stock certificate for 10,323 shares of J.D. Edwards & Co. stock from the transfer agent. Second, by the date of the letter, petitioner had already hand-delivered the stock certificate to Norwest for deposit into his rollover IRA.

Enclosed in the above letter is a "Settlement Statement (Prepared 8/11/98 with values as of 7/15/98)". According to that statement, the market value of petitioner's current vested account balance in the ESOP amounted to $467,817.48. The statement says that $467,766.10 of that amount was paid to petitioner in the form of 10,323 shares of J.D. Edwards & Co. stock. The stock was valued as of July 15, 1998, at $45.31 per share. The statement also says that the payment to petitioner was "less withholding" of $51.38 "consisting of your cash account and fractional shares". We note that the value of petitioner's fractional share, $41.07 (i.e., 0.90164 x $45.31), plus the cash balance in his account, $10.31, is $51.38.

On October 2, 1998, petitioner executed a Norwest form entitled Self-Directed IRA Rollover/Direct Rollover Documentation. According to that form, petitioner's signature signified his irrevocable election, "pursuant to IRS regulation 1.402(a)(5)-1T, to treat this contribution [viz. of 10,323 shares of J.D. Edwards & Co. stock] as a rollover contribution." Petitioner's signature appears on the form a second time in order to give Norwest the following "Commingling Authorization":

> The undersigned authorizes the Trustee/Custodian to commingle regular IRA contributions with rollover/direct rollover contributions pursuant to Part II above. I understand that commingling regular IRA contributions with rollover/direct rollover contributions from employer plans may preclude me from rolling over funds in my rollover IRA into another qualified plan or 403(b) plan. With such knowledge, I

authorize and direct the Trustee/Custodian to place
regular IRA contributions in my rollover IRA or vice
versa.

Sometime after petitioner had hand-delivered his J.D. Edwards & Co. stock certificate to Norwest, representatives of Norwest prepared the paperwork necessary to permit the registration and sale of petitioner's shares, and they sent the paperwork to petitioner for completion. The completed paperwork was received from petitioner by Norwest's office in Boulder, Colorado, on or about October 7, 1998, and was forwarded to Norwest's home office in Minneapolis, Minnesota. The paperwork and the stock certificate were then sent to the transfer agent on or about October 20, 1998, and the shares of stock were registered in unrestricted form on or about November 4, 1998.

Norwest sold petitioner's J.D. Edwards & Co. stock on or about November 16, 1998. The statement for petitioner's IRA for the period ending November 30, 1998, reflects the following sales of J.D. Edwards & Co. stock:

| Trade Date | Shares | Price | Net Proceeds (after Commissions) |
|---|---|---|---|
| Nov. 19, 1998 | 300 | $32.750 | $9,786.79 |
| Nov. 19, 1998 | 23 | 32.750 | 750.62 |
| Nov. 19, 1998 | 8,000 | 32.625 | 260,087.75 |
| Nov. 19, 1998 | 2,000 | 32.812 | 65,396.92 |
| | 10,323 | 32.737 | 336,022.08 |

The above proceeds were invested in a money-market mutual fund and earned dividend income in the amount $509.90 for the

remaining 12 days of November and $1,322.35 for the month of December. Thus, through the end of 1998, petitioner's IRA earned dividend income in the aggregate amount of $1,832.25 on the net proceeds realized from the sale of his J.D. Edwards & Co. stock.

In early 1999, the ESOP's trustee, Wells Fargo Bank, issued to petitioner a Form 1099-R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc., for tax year 1998. According to that form, during 1998, petitioner had received gross distributions from the J.D. Edwards ESOP of $467,817.48 of which the taxable amount is $42,695.14, and on which Federal income tax of $51.38 had been withheld. Similarly, Norwest Bank Minnesota, N.A., issued to petitioner a Form 5498, IRA Contribution Information, on behalf of Norwest Bank MN NA IRA C/F Ramzy Kopty reporting rollover contributions of $411,629.63 for 1998. According to that form, the fair market value of petitioner's IRA account was $337,854.33.

During 1999, petitioner's IRA earned dividend income in the aggregate amount of $6,093.21. During the year, petitioner caused Norwest to make distributions from his IRA in the aggregate amount of $331,500, as follows:

| Date | Amount |
|------|--------|
| Jan. 4, 1999 | $70,000 |
| Jan. 4, 1999 | 20,000 |
| Feb. 1, 1999 | 15,000 |
| Apr. 26, 1999 | 30,000 |

| | |
|---|---|
| May 13, 1999 | 30,000 |
| May 31, 1999 | 15,000 |
| July 19, 1999 | 20,000 |
| July 19, 1999 | 50,000 |
| Sept. 20, 1999 | 10,000 |
| Oct. 18, 1999 | 20,000 |
| Oct. 18, 1999 | 10,000 |
| Oct. 25, 1999 | 17,000 |
| Nov. 15, 1999 | 10,000 |
| Nov. 29, 1999 | 10,000 |
| Dec. 1, 1999 | 4,500 |
| | 331,500 |

With one exception, all of the distributions that petitioner requested from his IRA were accompanied by a Norwest form entitled "Self-Directed IRA Withdrawal Request". According to each such form, the type of withdrawal that petitioner requested was "Premature Distribution (under age 59½) (no known exception)". Each form also instructed Norwest not to withhold Federal income tax from the amount distributed. The form states:

> If I elect not to have Federal income tax withheld, I am still liable for payment of Federal income tax on the taxable portion of my distribution; I also may be subject to tax penalties under the estimated tax payment rules, if my payments or estimated tax and withholding, if any, are not adequate.

Finally, as the source of the funds, each form states that "Funds will first be withdrawn from the liquid asset portion of my IRA."

Subsequently, during the year 2000, Norwest Bank Minnesota, NA, sent a Form 1099-R to petitioners reporting gross distributions of $331,500 from petitioner's IRA during 1999.

During 2000, the money invested in petitioner's IRA earned mutual fund dividends in the amount of $141.27. During that year, petitioner requested distributions of $10,000 from his IRA. By the end of 2000, the value of petitioner's IRA was zero. Wells Fargo Investments, LLC, later issued a Form 1099-R to petitioners reporting gross distributions of $10,000 from petitioner's IRA during the year 2000. The record of this case suggests that Wells Fargo Bank acquired Norwest, but it does not say when the acquisition took place.

Petitioners filed their Federal income tax return for 1998 on October 18, 2000. The return had been prepared by Arthur Anderson. Consistent with the Form 1099-R issued to petitioners by Wells Fargo Bank, and the Form 5498, IRA Contribution Information, issued by Norwest Bank Minnesota, N.A., petitioners' 1998 return reports total pensions and annuities of $467,817. Petitioners' 1998 return reports that the taxable amount of the distribution is "NONE". Petitioners' 1998 return also reports income tax withholding of $51. Finally, petitioners' 1998 return reports none of the dividend income earned by petitioners' IRA during 1998 in the aggregate amount of $1,832.25.

In passing, we note that by October 18, 2000, when petitioners filed their return for 1998, and reported that "NONE" of the ESOP distribution was taxable, they had already withdrawn most, if not all, of the money from the IRA. Stated differently,

by October 18, 2000, the distributions received from Mr. Kopty's IRA amounted to most, if not all, of the proceeds realized from the sale of the J.D. Edwards & Co. stock and the income realized on those proceeds.

Prior to filing petitioners' return for 1998, Mr. Kopty had sent a letter to the Internal Revenue Service dated May 27, 2000, in which he explained why petitioners' 1998 return had not been filed. Petitioner's letter, which was mailed on June 6, 2000, states as follows:

> Please be informed that the 1998 taxes are held up due to an error made by my ex-employer J.D. Edwards in the preparation of the Form 1099. Please take note of the following:
>
> 1. The 1099 Form of J.D. Edwards indicates that the gross distribution is US $467,817.48 attached.
>
> 2. J.D. Edwards claims that the calculation for the above is based on 10,323 shares x $45.313 per share.
>
> 3. According to the bank statement, Norwest Investment Services the shares were $31.00 per share when they were finally "free and clear" on November 4, 1998. As a matter of fact, the shares were sold by Norwest Investment Services on November 16, 1998, for a total of $339,203 which is an average per share of $32.85. This was put in an IRA account.
>
> 4. I re-addressed this issue again with J.D. Edwards and based on their last response they believe that their calculation is correct. From what appears to be the issue is that <u>J.D. Edwards has made their calculation at a much higher price per share on July 15, 1998</u>. On the other hand, the shares

were not "free and clear" on that date of preparation which was solely under JDEdwards control.

5.    We are considering to hand this matter over to a legal adviser to resolve this matter since it has material repercussions on lost amounts and taxable income.

In order to avoid penalties and interests, we have forwarded to you earlier a check amount of US $13,529.00 to be considered as a pre-payment for the time being.  Also we would like to request from you any suggestions that will help us resolve this matter. [Emphasis added.]

In substance, the above letter states that the filing of petitioners' 1998 return was delayed due to an error made by Mr. Kopty's ex-employer, J.D. Edwards & Co., in preparing his Form 1099-R for 1998.  Petitioner complains that the gross distribution shown on the Form 1099-R in the amount of $467,817.48, valued as of July 15, 1998, greatly exceeds the proceeds realized from the sale of the shares on November 16, 1998, in the amount of $339,230.  Petitioner complains that the value of the distribution reported to the Internal Revenue Service on the Form 1099-R was based upon the higher price per share on July 15, 1998, when "the shares were not 'free and clear'".  In effect, petitioner's letter suggests that the Form 1099-R overstates the value of the stock issued to petitioner and, thus, overstates the amount includable in petitioners' income.  The letter refers to the fact that petitioner had made a "pre-payment" of tax of $13,529, and it requests "any suggestions

that will help us resolve this matter."

When petitioner transmitted his 1998 Federal income tax return to the IRS, he did so with a cover letter dated October 4, 2000, which states as follows:

Reference - 1998 taxes (Ramzy Kopty - SSN * * *)

The error in the 1099-R was discovered during the tax preparation in December 1999 which would have added an additional income of $42,695.14.  Immediately I contacted JD Edwards for the problem & did not receive any correction or attention to this date.

April, 2000 - with no correction from JD Edwards/their bank, and in avoidance of delay of payments I did a rough calculation without the $42,695.14 & immediately I forwarded a check on April 17, 2000 for the amount of $13,529.00 (copy attached)

June 2000 - and still, with no correction from JD Edwards/their bank I sent a detailed explanation to the IRS on June 6, 2000 [i.e., above-quoted letter dated May 27, 2000] with all the supporting documents (Attached) & requested any suggestions that will help resolve the matter.  I did not get a response from the IRS on this issue, and contrary, I received a letter dated September 18, 2000 (cover sheet attached for your reference) which included name & a contact of Robert Stathntan (telephone - 215- * * *)

Upon Receipt and on September 26, 2000 I called the IRS & talked to Ms. Kazlauskas who was very understanding to the issues and we agreed that I file the tax return (attached) citing the error & the pervious correspondence

Under the circumstance I would like you to consider all the above points while reviewing this situation and confirm to me your finding.  Additionally there was a medical factor involved in this time frame (attached medical report).  In view of my health situation I have also applied for long term disability with the Social security (Social security confirmation attached).

Thus, petitioner's transmittal letter of October 4, 2000, again raises the issue discussed in his letter dated May 27, 2000, quoted above. That issue involves his contention that the gross distribution reported on the Form 1099-R issued for 1998, consisting of the stock of J.D. Edwards & Co., is overstated, as shown by the fact that the amount reported on the Form 1099-R greatly exceeds the proceeds realized from the sale of the stock. The transmittal letter expresses petitioner's concern that the amount of the gross distribution reported on the Form 1099-R would cause additional income of $42,695.14 for 1998.

Petitioners filed their 1999 Federal income tax return on or about November 21, 2001. That return does not report any of the distributions from petitioner's IRA at Norwest during 1999 in the aggregate amount of $331,500. At the same time, the return reports none of the dividend income in the aggregate amount of $6,093.21 realized by petitioner's IRA during the year.

Petitioners also filed their 2000 Federal income tax return on or about November 21, 2001. That return does not report the distributions of $10,000 received from petitioner's IRA during 2000. Furthermore, that return does not report the dividends of $141.27 realized on the moneys invested in petitioner's IRA during 2000.

In the later part of 1999, petitioner consulted doctors at the cardiopulmonary department of the American Hospital in Dubai.

He was briefly treated in the emergency room of the American Hospital in Dubai on November 29, 1999, and approximately one week later, on December 6, 1999, he returned to the hospital to engage in a treadmill test.  The interpretation of that test states the following:

> Exercise EKG positive for Ischemie by EKG criteria.  No exercise induced chest pains or arrhythmia.  Normal BP response to exercise.  Impaired functional capacity for patient's age achieving 10.6 METS.

Subsequently, Mr. Kopty was admitted to the American Hospital in Dubai on March 3, 2000, with the symptoms of a heart attack.  Approximately 2 weeks later he was transported to the Universite Catholique De Louvain Cliniques Universitaires Saint-Luc, a hospital in Belgium, where he underwent coronary bypass and mitral valve repair on March 25, 2000.  Mr. Kopty was released on April 10, 2000, but was readmitted from time to time for further treatment through the end of June 2000.

The medical records submitted by petitioners make it clear that Mr. Kopty's heart attack and related medical problems between March and June of 2000 were serious.  Mr. Kopty's treating physician in Belgium wrote on July 29, 2000, "since March 3, 2000 Mr. Kopty had to stop his professional activities. It seems obvious that these activities will have to be strongly reduced in the future."

In November of 2004, after the Internal Revenue Service audited petitioners' returns for 1999 and 2000 and issued the

notice of deficiency which is at issue in this case, Mr. Kopty contacted Wells Fargo and asked the bank to issue a new Form 5498, IRA Contribution Information, for taxable year 1998 and new Forms 1099-R for taxable years 1999 and 2000. Pursuant to his request, Wells Fargo issued a new Form 5498 for 1998 stating that his IRA contribution for the year was zero, and it issued new Forms 1099-R reporting gross distributions from his account at Norwest of zero for 1999 and 2000.

OPINION

Taxability of the Distributions From Petitioner's IRA During 1999 and 2000

The principal issue in this case is whether petitioners are subject to tax, as provided by section 408(d)(1), on the aggregate distributions of $331,500 and $10,000 that they received from petitioner's IRA during 1999 and 2000, respectively. Petitioners argue that they are not subject to tax on those distributions because the account from which the distributions were made was not an IRA.

Mr. Kopty had established that account with Norwest in 1998, and he funded it by making a purported rollover contribution of the stock he had received as a distribution from the J.D. Edwards ESOP. According to petitioners, they learned in 2004, during the audit of their returns for 1999 and 2000, that Mr. Kopty had failed to complete the rollover contribution within 60 days following the day on which he had received the stock from the

ESOP, as required by section 402(c)(3). We discuss the basis for petitioners' assertion that Mr. Kopty failed to make a valid rollover in more detail below.

Based on the factual premise that Mr. Kopty failed to make a valid rollover, petitioners contend that Mr. Kopty's account at Norwest was not an IRA within the meaning of section 408(a) and they are not subject to tax on the distributions from that account. Furthermore, petitioners argue that the determination made by respondent in the notice of deficiency is based upon Norwest's incorrect conclusion that Mr. Kopty had made a valid rollover of his J.D. Edwards & Co. stock in 1998. They argue that, because Norwest's conclusion was wrong, the notice of deficiency, based thereon, must also be wrong. According to petitioners:

> respondents [sic] relied on the erroneous bank determination that the 1998 roll over of the ESOP to the IRA account * * * was valid and relied on the erroneous reporting that followed that determination by the bank. * * * Hence, respondent's determination in paragraph 3 [of the notice of deficiency] and consequently the deficiency notice is null and void.

Petitioners do not explain the legal basis, or cite any authority, for their conclusion that they are not subject to tax on the distributions from Mr. Kopty's account at Norwest. The general rule is that any amount "paid or distributed out of" an IRA is subject to tax as prescribed by section 72. See sec. 408(d)(1). Petitioners seem to be arguing that Mr. Kopty's

Norwest account is disqualified from being an IRA because it was funded by an excess contribution. To the contrary, an IRA is not necessarily disqualified by the fact that it accepted excess contributions, even if it was funded entirely with excess contributions. See Orzechowski v. Commissioner, 69 T.C. 750 (1978), affd. 592 F.2d 677 (2d Cir. 1979); see also Boggs v. Commissioner, 83 T.C. 132 (1984), affd. 774 F.2d 740 (7th Cir. 1985); Benbow v. Commissioner, 82 T.C. 941 (1984). In another context we concluded that excess contributions were not subject to tax when distributed by an IRA. See Campbell v. Commissioner, 108 T.C. 54 (1997) (holding that the taxpayer received basis to the extent of his "investment in the contract" under section 72(e)(6)). Petitioners have not made any such argument in this case.

Respondent urges the Court to reject petitioner's position. Respondent asserts that "the record clearly reflects that the position taken by petitioners on their 1998 return was correct" and that a valid rollover of the distribution received from the ESOP was made in that year. Furthermore, respondent points out that petitioners' 1998 return reported the receipt of the ESOP distribution in the amount of $467,817 and reported that the taxable amount of such distribution was "NONE". Respondent asserts that "petitioners are estopped, pursuant to the duty of consistency doctrine, from adopting a position on their 1999 and

2000 tax returns inconsistent with the position taken on their 1998 Return."

We agree with respondent that, under the facts of this case, Mr. Kopty made a valid rollover of the stock distribution he received from the J.D. Edwards ESOP in 1998. Accordingly, we reject the factual premise of petitioners' argument that Mr. Kopty's account at Norwest was not an IRA, and we find that the distributions from that account during 1999 and 2000 are subject to tax under sections 408(d)(1) and 72(a). We do not reach respondent's second point that petitioners are estopped under the duty of consistency from taking a different position on their 1999 and 2000 returns.

In order to fully address petitioners' argument, we must set out petitioners' argument in more detail. Petitioners acknowledge that they physically transferred the J.D. Edwards & Co. stock certificate to Norwest within 60 days of the date on which they received it, but they contend that they did not irrevocably elect to make a rollover contribution to the IRA at that time. According to petitioners, the stock certificate "was hand-delivered to Norwest Bank [only] for safekeeping until the shares become our [sic] unrestricted and eventually sold." They assert that "the bank placed the restricted shares by mistake in the new account while the bank proceeded with the paperwork to un-restrict and sell the shares."

Petitioners contend that the stock certificate did not properly become invested in the IRA account until October 2, 1998, when Mr. Kopty executed the Norwest form entitled "Self-Directed IRA Rollover/Direct Rollover Documentation". Petitioners point out that October 2, 1998, is 79 days after Mr. Kopty had constructively "received" the certificate on July 15, 1998, and is beyond the 60-day period specified in section 402(c)(3) during which a distributee is required to transfer the property distributed to an eligible retirement plan. Petitioners further contend that the form executed on October 2, 1998, was not properly completed and did not serve to transfer the stock to Norwest. In effect, petitioners' position is that Mr. Kopty did not elect to treat the contribution of his J.D. Edwards & Co. stock certificate as a rollover contribution until October 2, 1998, when he executed the Norwest form entitled "Self-Directed IRA Rollover/Direct Rollover Documentation".

According to the regulations promulgated under section 402, an election to treat a contribution to an IRA as a rollover contribution is made simply by designating the contribution as a rollover contribution. The regulations promulgated under section 402 provide as follows:

> In order for a contribution of an eligible rollover distribution to an individual retirement plan to constitute a rollover and, thus, to qualify for current exclusion from gross income, a distributee must elect, at the time the contribution is made, to treat the contribution as a rollover contribution. An

> election is made by designating to the trustee, issuer, or custodian of the eligible retirement plan that the contribution is a rollover contribution. This election is irrevocable. Once any portion of an eligible rollover distribution has been contributed to an individual retirement plan and designated as a rollover distribution, taxation of the withdrawal of the contribution from the individual retirement plan is determined under section 408(d) rather than under section 402 or 403. Therefore, the eligible rollover distribution is not eligible for capital gains treatment, five-year or ten-year averaging, or the exclusion from gross income for net unrealized appreciation on employer stock. [Sec. 1.402(c)-2, Q&A-13, Income Tax Regs.; emphasis added.]

Thus, no particular form is required by the regulations in order to designate a contribution as a rollover contribution.

In this case, petitioner opened a "Rollover IRA" at Norwest on July 8, 1998, and he hand-delivered his J.D. Edwards & Co. stock certificate to Norwest on August 4, 1998, several days after the transfer agent had mailed the stock certificate to him. According to the receipt issued to petitioner by a representative of Norwest, "Deposit to account" was the purpose for which Norwest received petitioner's stock certificate. Petitioner's only account at Norwest was the "Rollover IRA" which he had opened by submitting an application to Norwest on or about July 8, 1998. Furthermore, the statement issued by Norwest for petitioner's IRA for the period ending August 31, 1998, reflects a "stock rollover" of 10,323 shares of J.D. Edwards & Co. stock on August 24, 1998. Thus, it is evident that Norwest, the trustee, issuer, or custodian of the IRA, believed that

petitioner had designated his J.D. Edwards & Co. stock as a "rollover contribution" to his IRA. See sec. 1.402(c)-2, Q&A-13, Income Tax Regs.

Petitioner's contribution of J.D. Edwards & Co. stock to his IRA and his designation of the contribution as a rollover contribution took place well within 60 days of receipt as required by section 402(c)(3). This is true no matter what we use as the starting date, that is, "the day on which the distributee received the property distributed." See sec. 402(c)(3). In this case, the starting date of the 60-day period could be the date on which petitioner constructively received the stock, July 15, 1998. See generally Rev. Rul. 82-75, 1982-1 C.B. 116 and Rev. Rul. 81-158, 1981-1 C.B. 205 (holding that, for purposes of section 402, the distributee received shares from an employer established profit-sharing plan that qualified under section 401(a) when the trustee of the plan delivered to the transfer agent stock certificates previously issued in the trustee's name, together with written instructions to reissue the certificates in the name of the distributee). The starting date could also be the date on which petitioner actually received the stock. Petitioner actually received the stock certificate between July 30, 1998, when the transfer agent mailed it to him, and August 4, 1998, when he hand-delivered the stock certificate to Norwest.

Furthermore, in this case, the 60-day period is satisfied regardless of the date used as the date of the "transfer of a distribution". See sec. 402(c)(3). That date could be August 4, 1998, the day on which petitioner hand-delivered the certificate to Norwest, or August 24, 1998, the day on which Norwest recorded the transfer on its statement for petitioner's IRA for the period ending August 31, 1998.

Petitioners do not deny that they intended to rollover the distribution which Mr. Kopty received in 1998 from the J.D. Edwards & Co. ESOP. Further, they do not deny that Mr. Kopty delivered his J.D. Edwards & Co. stock certificate to Norwest on August 4, 1998. What they argue is that when Mr. Kopty hand-delivered the stock certificate to Norwest on August 4, 1998, he intended to give the certificate to Norwest only for safekeeping, pending the reissuance of the stock without restriction and its sale. Petitioners assert that Norwest made a mistake by depositing the stock into petitioner's IRA before October 2, 1998, the date on which petitioner executed the Norwest form entitled "Self-Directed IRA Rollover/Direct Rollover Documentation".

One problem we have with this factual contention is that there is nothing in the record, other than petitioners' testimony, to substantiate it. Certainly, Mr. Kopty did nothing to call this alleged mistake to the attention of the Norwest

representative who issued the receipt for Mr. Kopty's stock certificate. Additionally, Mr. Kopty said nothing about this alleged mistake when he received the August 1998 statement for his IRA on which was recorded a "stock rollover DS" on August 24, 1998, consisting of 10,323 shares of J.D. Edwards & Co. stock.

Furthermore, petitioners' argument presupposes that no rollover to Mr. Kopty's IRA at Norwest could take place for purposes of section 402(c) unless and until the form entitled "Self-Directed IRA Rollover/Direct Rollover Documentation" was submitted to Norwest. To the contrary, as discussed above, the regulations promulgated under section 402 merely require the contribution to be designated a rollover contribution. The Norwest form which petitioner executed on October 2, 1998, entitled "Self-Directed IRA Rollover/Direct Rollover Documentation" may have been helpful in terms of petitioner's relationship with Norwest, to document Mr. Kopty's wishes, but it was not essential for purposes of finding a rollover contribution under section 402(c).

Finally, petitioners' assertion that Mr. Kopty transferred the stock certificate to Norwest only for safekeeping until the shares could be reissued in unrestricted form and sold is contradicted by Mr. Kopty's actions. The fact is that Mr. Kopty executed the form on October 2, 1998, well before the shares were registered in unrestricted form and sold on November 16, 1998.

Indeed, it appears that Mr. Kopty may have executed the form even before he returned to Norwest the paperwork necessary to permit the registration and sale of the shares. As mentioned above, the completed paperwork to permit the registration and sale of petitioner's stock was not received from petitioner by Norwest's office in Boulder until October 7, 1998.

Based on the facts of this case, we find that Mr. Kopty made an irrevocable election to roll over, to his IRA, the distribution of stock he had received from the J.D. Edwards ESOP. We further find that petitioner made this irrevocable election within the 60-day period required by section 402(c)(3).

Ten Percent Additional Tax on Early Distributions

The second issue in this case is whether petitioners are liable for the 10-percent additional tax on early distributions from qualified retirement plans imposed by section 72(t)(1). Respondent applied the 10-percent additional tax on the aggregate distributions of $331,500 made by petitioner's IRA in 1999 and the aggregate distributions of $10,000 made by the IRA in 2000. Accordingly, respondent determined taxes under section 72(t)(1) for 1999 and 2000 in the amounts of $31,500 and $1,000, respectively.

Petitioners argue that section 72(t)(1) does not apply to any of the subject distributions because all of them qualify under the exception set forth in section 72(t)(2)(A)(iii) for

distributions "attributable to the employee's being disabled within the meaning of subsection (m)(7)". Section 72(m)(7) provides as follows: "an individual shall be considered disabled if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration". See also sec. 1.72-17A(f)(1), Income Tax Regs. Whether an impairment constitutes a disability is to be determined with reference to all of the facts in the case. Sec. 1.72-17A(f)(2), Income Tax Regs. The regulations provide examples of impairments which would ordinarily be considered as preventing substantial gainful activity. One of those examples is the following:

> Diseases of the heart, lungs, or blood vessels which have resulted in major loss of heart or lung reserve as evidenced by X-ray, electrocardiogram, or other objective findings, so that despite medical treatment breathlessness, pain, or fatigue is produced on slight exertion, such as walking several blocks, using public transportation, or doing small chores * * * [Sec. 1.72-17A(f)(2)(iii), Income Tax Regs.]

The regulations point out that the existence of one or more of the impairments described therein, including the one quoted above, "will not, however, in and of itself always permit a finding that an individual is disabled as defined in section 72(m)(7)." See sec. 1.72-17A(f)(2), Income Tax Regs. Furthermore, the regulations caution that any impairment must be evaluated in terms of whether it does in fact prevent the

individual from engaging in his customary or any comparable substantial gainful activity. Id. In order to meet the requirements of section 72(m)(7), the regulations provide that "an impairment must be expected either to continue for a long and indefinite period or to result in death." Sec. 1.72-17A(f)(3), Income Tax Regs. An impairment which is remediable does not constitute a disability, and an individual will not be deemed disabled if it can be diminished to the extent that the individual can engage in his customary or any comparable substantial gainful activity. Sec. 1.72-17A(f)(4), Income Tax Regs. Furthermore, a taxpayer may be engaged in a gainful activity even though he realizes a net loss from that activity during the year. See Dwyer v. Commissioner, 106 T.C. 337, 341 (1996).

In this case, petitioners introduced into evidence certain medical records involving the medical treatment of Mr. Kopty's heart condition. Based upon those records they claim that "from 1999 onwards, Ramzy Kopty was disabled due to heart failure and unable to engage in any substantial gainful activity." According to petitioners, Mr. Kopty "had no income after 2000 which is reflected in petitioners['] tax returns for the years 2001, 2002, 2003, 2004." Petitioners assert that Mr. Kopty receives long-term disability benefits from the U.S. Social Security Administration. Based upon Mr. Kopty's heart disease,

petitioners assert that they are not subject to the 10-percent additional tax on early distributions under section 72(t) because all of the distributions are attributable to Mr. Kopty's being disabled within the meaning of section 72(m)(7).

As to the distributions made during 1999, we do not accept petitioners' assertion that the distributions are attributable to Mr. Kopty's being disabled. According to the medical records submitted by petitioners, Mr. Kopty was briefly treated in the emergency room of the American Hospital in Dubai on November 29, 1999, and approximately 1 week later, on December 6, 1999, returned to engage in a treadmill test. According to petitioners' brief: "petitioner was diagnosed in 1999 with Pectoris Spasm and Ischemia which limited petitioner's ability to have gainful activity from 1999 onwards and that the same disease led to an myocardial infarction (MI) in March 2000." That diagnosis, however, did not even take place until December 6, 1999, at the earliest. By that time, all of the distributions for 1999 had been made. In our view, the record of this case fails to show that any of the distributions made during 1999 in the amount of $331,500 were attributable to Mr. Kopty's being disabled.

As to the distributions made during 2000, Mr. Kopty was admitted to the American Hospital in Dubai on March 3, 2000, with the symptoms of a heart attack. Approximately 2 weeks later, he

was transported to a hospital in Belgium where he underwent coronary bypass and mitral valve repair on March 25, 2000. Mr. Kopty was released on April 10, 2000, but was readmitted from time to time for further treatment through the end of June 2000. The medical records submitted by petitioners make it clear that Mr. Kopty's heart attack and related medical problems between March and June of 2000 were serious. Mr. Kopty's treating physician in Belgium wrote on July 29, 2000: "since March 3, 2000 Mr. Kopty had to stop his professional activities. It seems obvious that these activities will have to be strongly reduced in the future."

The record in this case, however, makes it difficult to find that Mr. Kopty was "disabled" within the meaning of section 72(m)(7) by his heart condition. First, after June of 2000 he continued to travel between Dubai and Belgium. He testified at trial about the steps which he had to take in order to close his business in Dubai and "relocate" to Belgium. Furthermore, petitioners' income tax return for 2000 includes a Schedule C of Mr. Kopty's sole proprietorship which reflects business expenses of $52,457 for the year. The expenses claimed on that Schedule C include travel expenses of $2,450, expenses for meals of $1,760, and telephone expenses of $6,380. The business activities suggested by those expenses belie petitioners' claim that Mr. Kopty was "unable to engage in any substantial gainful activity"

during the year. See sec. 72(m)(7). Significantly, petitioners'
return for 2000 also reports that Mr. Kopty received wages of
$22,795.28 from J.D. Edwards World Solutions. Finally, Mr. Kopty
presented his case at trial. The Court had an opportunity to
observe him over the course of 2 days. The Court detected no
medical disability in his presentation of the case to the Court.

Addition to Tax Under Section 6651(a)(1) Determined With Respect
to Petitioners' 1999 Return

The time for filing petitioners' 1999 return was extended to
December 15, 2000. Petitioners filed their 1999 return on
November 21, 2001, and, thus, they failed to file a timely
return. Accordingly, respondent determined an addition to tax
under section 6651(a)(1) of $23,674.83 in the notice of
deficiency. We find that respondent satisfied his burdens of
production under section 7491(c) with respect to the addition to
tax under section 6651(a). See Higbee v. Commissioner, 116 T.C.
438, 446-447 (2001).

Petitioners argue that they are not liable for the addition
to tax under section 6651(a)(1) because their failure to file a
timely return for 1999 was due to reasonable cause and not due to
willful neglect. See sec. 6651(a)(1). According to petitioners,
reasonable cause for the late filing of their 1999 return is
demonstrated by three points: First, Mr. Kopty's medical
history, including his heart attack on March 3, 2000, and his
related medical issues; second, the alleged fact that petitioners

never received the Form 1099-R issued by Norwest for 1999 reporting the distributions from Mr. Kopty's IRA during the year totaling $331,500; and third, the fact that petitioners reported a loss on their 1999 return and did not believe that the filing of their 1999 return was an urgent matter, especially in light of Mr. Kopty's medical problems during that year.

Petitioners assert the late filing of their 1999 return was not due to willful neglect. According to petitioners, they were "proactive with the ESOP issue" in that they corresponded with J.D. Edwards & Co. through Mr. Kopty's letter dated February 9, 2000, and they communicated with the Internal Revenue Service through Mr. Kopty's letters dated April 15, 2000, May 27, 2000, and October 4, 2000, and Mr. Kopty's telephone call on September 26, 2000.

We do not believe that petitioners have shown that their failure to file a timely 1999 return was due to reasonable cause and not due to willful neglect. As stated above, we agree that Mr. Kopty's heart attack in March of 2000 and his related surgeries and medical care through June of 2000 were serious. Nevertheless, the record of Mr. Kopty's correspondence and other activities during the year fails to explain why petitioners did not file, or could not have filed, their return for 1999 on or before the due date, December 15, 2000. Indeed, notwithstanding Mr. Kopty's medical condition, petitioners filed their 1998

return on October 18, 2000. At that point, they had ample time before the due date of the 1999 return in which to file that return as well. Furthermore, we reject petitioners' assertion that they should be relieved of the addition to tax under section 6651(a)(1) because they did not receive the Form 1099-R from Norwest or because they did not think that the filing of that return was "an urgent matter".

Imposition of the Accuracy-Related Penalty Under Section 6662(a) With Respect to Petitioners' 1999 Return

Respondent determined petitioners' liability for the accuracy-related penalty under section 6662(a) to be $12,793.13. Respondent determined that a portion of the underpayment of tax required to be shown on petitioners' 1999 return is attributable to negligence or disregard of rules or regulations, or to a substantial understatement of income tax. See sec. 6662(b)(1) and (2). For this purpose, "the term 'negligence' includes any failure to make a reasonable attempt to comply with the provisions of this title, and the term 'disregard' includes any careless, reckless, or intentional disregard." Sec. 6662(c). An understatement of income tax is "substantial" if the amount of the understatement exceeds the greater of (a) 10 percent of the tax required to be shown on the return, or (b) $5,000. Sec. 6662(d)(1)(A).

We agree with respondent that the portion of the underpayment of tax on which respondent imposed the accuracy-

related penalty is attributable to negligence or disregard of rules or regulations. Furthermore, we find that respondent has carried his burden of production with respect to the addition to tax under section 6662(a). See Higbee v. Commissioner, supra at 448-449.

Petitioners' return for 1998 reported the ESOP distribution of $467,817 and further reported the taxable amount of that distribution as "NONE". That return is consistent with the Form 5498 issued by Norwest for the year 1998 which shows rollover contributions of $411,629.63, and it is consistent with the Norwest statement for petitioner's IRA for the period ending August 31, 1998, showing a stock rollover into the account on August 24, 1998, consisting of 10,323 shares of J.D. Edwards & Co. stock. Petitioners' 1998 return was not filed until October 4, 2000, by which time almost all of the money in Mr. Kopty's IRA had been withdrawn. In filing their 1998 return claiming that the ESOP distribution was not taxable, petitioners knew, or should have known, that the distributions from Mr. Kopty's IRA during 1999 and 2000 were subject to tax under section 408(d). Accordingly, when they filed their return for 1999 on November 21, 2001, and reported none of the distributions as income, we agree with respondent that the portion of the underpayment of tax resulting therefrom is attributable to negligence or disregard of rules or regulations. Furthermore, petitioners not only failed

to report the IRA distributions during 1999 as taxable income, but they also failed to report any of the dividend income in the amount of $6,093.21 earned by the IRA during 1999.

Petitioners assert that they are not liable for the accuracy-related penalty under section 6662(a) for three reasons. First, petitioners claim that, at the time they filed their 1999 return, they did not know whether the rollover in 1998 was valid because "respondents [sic] never answered their several assistance appeals" and petitioners had not received the Form 1099-R for 1999 from Norwest. Second, petitioners assert that respondent has determined their liability for the accuracy-related penalty "to hide their [sic] [respondent's] negligence of not responding to petitioners appeal for assistance with the ESOP transaction". Third, petitioners assert that they "exercised extreme duty of care towards to the ESOP transaction issue under severe circumstances of being abroad and seriously ill".

In summary, petitioners argue that, before they filed their 1999 return, they asked for advice from respondent concerning the validity of the rollover in 1998, and, when they received no response from their inquiries from respondent, they did the best they could under the circumstances of being abroad and with Mr. Kopty's health issues. Petitioners appear to invoke the reasonable cause exception under section 6664(c) which provides that no penalty shall be imposed with respect to any portion of

an understatement if it is shown that there was a reasonable cause for such portion and the taxpayer acted in good faith with respect to such portion.

We agree that petitioners corresponded with representatives of the Internal Revenue Service prior to filing their 1999 return (Mr. Kopty's letter dated May 27, 2000, which was sent on June 6, 2000, and his transmittal letter dated October 4, 2000). We also agree that Mr. Kopty engaged in correspondence with Norwest and J.D. Edwards & Co. during 2000 regarding the distribution from the ESOP. That correspondence shows that Mr. Kopty was unhappy about the fact that his shares of J.D. Edwards & Co. stock were not sent until July 30, 1998, and were unregistered shares that could not be immediately sold. According to one of petitioner's letters to J.D. Edwards & Co., the "ESOP shares were supposed to have been received in April 'clear for sales' from J.D. Edwards." During the delay, the value of the shares decreased from $467,766.10, the value on July 15, 1998, to $336,022.08, the value of the shares on November 16, 1998, when they were sold. Petitioner was concerned by the fact that the Form 1099-R which he received from the ESOP was based upon the value of the shares on July 15, 1998, and showed the taxable amount of such distribution to be $42,695.14. When Mr. Kopty stated in his letter to the Internal Revenue Service dated May 27, 2000: "also we would like to request from you any suggestions that will help

us resolve this matter", he was referring to this valuation issue. Similarly, petitioner's letter dated October 4, 2000, transmitting petitioners' 1998 tax return to the Internal Revenue Service, refers to the same error in the Form 1099-R. Petitioners' letter states: "under the circumstances I would like you to consider all of the above points while reviewing this situation and confirm to me your finding." Petitioner's letter was again asking the Internal Revenue Service to review the Form 1099-R issued by the ESOP on which petitioner's shares of J.D. Edwards & Co. stock were valued as of July 15, 1998, in the amount of $467,766.10, whereas the net proceeds from the sale of the stock on November 16, 1998, were $336,022.08.

In none of petitioner's correspondence with the Internal Revenue Service does he raise a question about the validity of the rollover of J.D. Edwards & Co. stock into his IRA or the Forms 1099-R issued to report the distributions from the IRA in 1999 and 2000. In fact, petitioners' opening brief states that they did not become aware "that the ESOP rollover was invalid in 1998 due to the 60 days rollover rule" until the audit of their 1999 and 2000 returns which took place between April and September of 2004. We reject any suggestion that petitioners raised with respondent, before the audit of their returns, an issue concerning the validity of the rollover contribution of J.D. Edwards & Co. stock to Mr. Kopty's IRA. In conclusion, we

find that petitioners have not shown that there was reasonable cause for the understatement of tax required to be shown on their 1999 return or that they acted in good faith with respect thereto.

Computational Errors

In their posttrial brief, petitioners allege three "computational errors" for the first time in these proceedings. The first computational error involves the amount of the net operating loss for taxable 2000 that can be carried back to 1999. According to petitioners, respondent miscalculated the net operating loss by basing the calculation on adjusted gross income of -$5,522, rather than on -$15,522, the correct amount.

Petitioners failed to raise this issue in their petition, and it is not before the Court. We do not consider an issue that has not been pleaded. See, e.g., Frentz v. Commissioner, 44 T.C. 485, 491 (1965), affd. 375 F.2d (6th Cir. 1967); Sicanoff Vegetable Oil Corp. v. Commissioner, 27 T.C. 1056, 1066 (1957) (and the cases cited thereon), revd. on other grounds 251 F.2d 764 (7th Cir. 1958). This is particularly true in a case like this where the issue cannot be considered without surprise and prejudice to the other party. See Estate of Mandels v. Commissioner, 64 T.C. 61, 73 (1975). Furthermore, we note that the difference of $10,000, about which petitioners complain, is due to the inclusion in gross income of the distributions of

$10,000 from Mr. Kopty's IRA during the year.

The second so-called computational error alleged by petitioners involves deductions for moving expenses under section 217(a). Apparently, during the audit of petitioners' returns, petitioners submitted a letter in which they claimed moving expenses in the amount of $5,770 for 1999 and $1,950 for 2000. In the notice of deficiency, respondent did not determine that petitioners were allowed moving expenses. Petitioners ask the Court "to order the moving expense correction."

Petitioners did not raise this matter in their petition. This is a new issue that was raised for the first time after trial. As stated above, we do not consider an issue that has not been pleaded. See, e.g., <u>Frentz v. Commissioner</u>, <u>supra</u>; <u>Sicanoff Vegetable Oil Corp. v. Commissioner</u>, <u>supra</u>. This is particularly true in a case like this where the issue cannot be considered without surprise and prejudice to the other party. See <u>Estate of Mandels v. Commissioner</u>, <u>supra</u>. Accordingly, we will not consider it.

Finally, petitioners argue that interest on underpayments under section 6601(a) should be computed from the date when the tax return was due, taking into consideration extensions of time to file, rather than from the original due date of the return. Petitioners ask the Court to rule that interest on any underpayment for taxable 1999 should begin on December 15, 2000,

rather than on April 15, 2000.

Petitioners are correct when they state in their brief that this issue is not properly before the Court at this time. Moreover, we note that, pursuant to section 6601(a), interest begins to run on "the last date prescribed for payment" of the tax and, pursuant to section 6151(a), an extension of time for filing an income tax return does not extend the time for paying the tax due.

Based upon the foregoing,

<u>Decision will be entered for</u>

<u>respondent</u>.